O

# United States District Court
# Central District of California

| | |
|---|---|
| PRECISION ORTHOPEDIC IMPLANTS, INC., a California corporation; BARRY DWORKIN, an individual, | Case № 2:16-cv-02945-ODW (PLA) |
| Plaintiffs, | |
| v. | **ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION [11]** |
| LIMACORPORATE S.P.A., an Italian public limited company; GABRIELE LUALDI, an individual; MICHELE PIOVANI, an individual; STEFANO CIMATORIBUS, an individual; and DOES 1 through 100, inclusive, | |
| Defendants. | |

## I.   INTRODUCTION

Before the Court is Defendants Stefano Cimatoribus and Gabriele Lualdi's motion to dismiss for lack of personal jurisdiction.  (ECF No. 11.)  For the reasons

discussed below, the Court **GRANTS** the motion to dismiss as to Defendant Cimatoribus and **DENIES** the motion to dismiss as to Defendant Lualdi.[1]

## II.    FACTUAL BACKGROUND

Plaintiff Precision Orthopedic Implants, Inc. is a California corporation wholly-owned by Plaintiff Barry Dworkin, a California resident.  (Compl. ¶¶ 1–2, 12, ECF No. 1–1.)    Dworkin began working in orthopedics in 1980 and has extensive experience selling medical devices.  (Dworkin Decl. ¶ 2, ECF No. 14.)

Defendant Limacorporate S.P.A. is an Italian public limited company that manufactures shoulder replacement implants and other medical devices and primarily conducts business in the United States through its subsidiary, Lima USA.  (Compl. ¶¶ 3, 9, 27.)  Defendant Gabriele Lualdi was the president of Limacorporate's board of directors at all times relevant to the case at bar and president of Lima USA from November of 2011 until September of 2013.[2]    (Lualdi Decl.  ¶¶ 3–4.)   Defendant Michele Piovani is the Business Development Director of Limacorporate.  (Compl. ¶  5.)  Defendant Stefano Cimatoribus is an employee of Limacorporate involved in business development.  (*Id.* ¶ 6.)

Limacorporate began considering an entrance into the U.S. medical device market in 2011.  (*Id.* ¶¶ 9, 11.)  In August of 2011, Limacorporate was searching for U.S. distributors and reached out to Dworkin as a potential California distributor.  (Dworkin Decl. ¶ 9.)  Over the course of several emails with Cimatoribus, Dworkin agreed to meet Piovani at Los Angeles International Airport ("LAX") on September 1, 2011, to discuss the position.  (*Id.* ¶ 11.)  By all accounts this meeting went well, and Dworkin claims that Piovani made a verbal "commitment" to award him Los Angeles as his "exclusive territory" to distribute Limacorporate's devices.  (Compl. ¶ 11; ECF No. 14, Ex. 8.)   At the same meeting, Piovani allegedly told Dworkin that all of Limacorporate's products had been approved by the FDA except for two: the DiPhos

---

[1]  After considering papers filed in support of and in opposition to the Motion, the Court deems the matter appropriate for decision without oral argument.  Fed. R. Civ. P. 78(b); C.D. Cal. L.R. 7-15.
[2]  He has since retired.  (Lualdi Decl. ¶ 3, ECF No. 11–1.)

H[3] and a device for resurfacing bones.  (Dworkin Decl. ¶ 12)  However, Piovani represented that these two devices would be approved within two months.  (*Id.*)

Dworkin met with Defendant Piovani at LAX again on November 7, 2011.  (*Id.* ¶ 24.)  During this meeting, the parties allegedly "further discussed" Dworkin's becoming the Los Angeles distributor for Limacorporate.  (*Id.*)  On November 28, 2011, Dworkin received an email from Cimatoribus, on behalf of Piovani, substantially reducing the territory over which he would have exclusivity; he was now to have exclusive control over only Ventura and Santa Barbara Counties and a list of ten to fifteen Los Angeles surgeons.  (*Id.* ¶ 25; ECF No. 14, Ex. 17.)  The email also included a shell representative agreement[4] and requested that Dworkin send back an estimate of the number of device sales he thought were feasible over a three-year period in the territory.[5]  (Dworkin Decl. ¶ 28; ECF No. 14, Ex. 17.)  On December 6, 2011, Defendant replied to the email with an estimate[6] of how many devices he thought he could sell in each of Limacorporate's six device categories and requested some modifications to the contract.[7]  (ECF No. 14, Ex. 19.)  Dworkin then hired David Rogers as a sales representative.  (Dworkin Decl. ¶ 34.)

On January 20, 2012, Cimatoribus conveyed an offer to Dworkin allowing him a twenty-five percent commission on net sales.  (*Id.* ¶ 36.)  Cimatoribus followed up six days later with another email containing the "final draft" of the agreement.  (*Id.* ¶ 38.)  The proposed five-year contract required that Dworkin meet certain minimum sales "guarantees" to avoid early termination.  (*Id.* ¶ 40.)  These minimum sales "guarantees" were calculated by multiplying Dworkin's previous estimate of the

---

[3] This is a type of humeral plate replacement device.  (Compl. ¶ 19.)

[4] This draft agreement was expressly with Lima USA, not Limacorporate.  (ECF No. 14, Ex. 17 at 4.)

[5] The terms of this shell contract are virtually identical to those in the final agreement with the exception of the territory and doctors covered.  (ECF No. 14, Ex. 35 at 2.)

[6] Dworkin alleges that his estimate was based on very limited knowledge of the products.  (Dworkin Dec. ¶ 31.)

[7] Dworkin left question marks in the DiPhos H and resurfacing categories presumably because he did not know when those devices would be available.  (ECF No. 14, Ex. 19 at 2.)

number of devices he believed he could sell with the average sales price per device.[8] (*Id.*)  Dworkin believed that inclusion of these minimum sales "guarantees" in the contract meant that such sales were attainable in his exclusive territory.  (*Id.*)  This draft also included a list of products and their respective prices.  (*Id.*)  Dworkin believed that all of the products on the list would be available to him for sale.  (*Id.* ¶ 39.)

Dworkin was not happy with the draft's territorial clause which reduced his exclusive territory from "all of the Los Angeles area to a few hospitals and surgeons" and excluded Dr. John Itamura, his primary surgical contact.  (*Id.* ¶ 41.)  Between receiving that draft and mid-February, Dworkin negotiated for more hospitals and more surgeons to be added to his exclusive territory.  (Compl. ¶ 16.)  This negotiation appears to have been primarily conducted in person with Piovani at a surgical conference in San Francisco.  (Dworkin Decl. ¶ 48.)  On February 24, 2012, a finalized agreement reflecting these additions was sent to Dworkin for his signature.[9] (Compl. ¶ 20.)  He signed and on March 7, 2012, Cimatoribus emailed him back a copy of the agreement featuring the signature of Gabriele Lualdi as President of Lima USA.  (Dworkin Decl.  ¶ 52.)

Dworkin and his sales associate David Rogers[10] then "commenced performance" and worked to distribute and sell the devices in the Los Angeles area from 2012 to early 2014.  (Compl. ¶ 30.)  However, their progress was hindered by the alleged unavailability of the full line of devices.  (*Id.* ¶ 31.)  In Dworkin's words, various products were not available, across "all categories."  (*Id.*)  Specifically, sample product shipments were delayed, training sessions for surgeons were not

---

[8] In the complaint, Plaintiffs allege that Defendants were the "sole source" of the minimum sales "guarantees" set forth in the contract.  (Compl. ¶ 20.)  Though they were presumably responsible for the contract in which the minimum sales figures appeared, Dworkin's declaration makes clear that he supplied the device numbers used in the calculation.  (Dworkin Decl. ¶ 40; ECF No. 14, Exs. 19, 25.)

[9] The territory eventually included Santa Monica, UCLA, the West Los Angeles VA hospital, Santa Barbara and Ventura counties and a list of eight surgeons.  (Compl. ¶ 17; ECF No. 14, Ex. 35 at 19.)

[10] At some point, Plaintiffs also hired Marcie Rohach as a sales associate.  (Compl. ¶ 39.)

scheduled until April of 2012, and "the first Limacorporate S.P.A. products were not available for sale until June of 2012." (*Id.* ¶ 30.)  For instance, the DiPhos H "was never available," the resurfacing device was not available "until the second or third quarter of 2013," and the popular 3 peg-glenoid was not available until the "fourth quarter" of 2013. (*Id.* ¶¶ 31, 34.)  The "full complement" of products was not available until the "last part" of 2013. (*Id.* ¶ 36.)

On November 7, 2013, a "U.S. product manager" told Dworkin that the minimum sales figures in the contract were "unrealistic and should be revised" and recognized Dworkin's "hard work." (Compl. ¶ 38.)  Nonetheless, on March 24, 2014, David Zeigler, Director of Sales and Marketing for Lima USA, informed Dworkin that based on a "lack of sales and market penetration" in Southern California, Lima USA was terminating its distribution agreement with Plaintiffs.[11] (ECF No. 14, Ex. 40.)  According to Plaintiffs, Lima USA continues to sell products in the Los Angeles area using Plaintiffs' previous sales associates. (Compl. ¶ 85.)

On December 22, 2015, Plaintiffs initiated arbitration against Lima USA on the terms set forth in the contract. (*Id.* ¶ 40.)  That arbitration is ongoing.[12] (Mot. 2, ECF No. 11.)  On March 16, 2016, Precision Orthopedic and Dworkin filed this action in the Los Angeles County Superior Court seeking two million dollars in damages and declaratory relief. (ECF No. 1–1.)  On April 29, 2016, Defendants removed this case to federal court. (ECF No. 1.)  This motion to dismiss is one of two currently pending before the Court in this matter. (*See* ECF No. 10.)

## III.   LEGAL STANDARD

Because there is no federal statute governing jurisdiction in this case, the Court applies the law of the state in which the district court resides. *See Panavision Int'l, L.P. v. Toeppen,* 141 F.3d 1316, 1320 (9th Cir. 1998).  California's long arm jurisdictional statute is coextensive with the federal due process requirement. *See id.*

---

[11] Plaintiffs admit that the minimum sales figures were "not achieved" but provide no additional detail. (*See* Compl. ¶ 38.)

[12] Limacorporate declined to join the arbitration. (Opp'n 2, ECF No. 13.)

(citing Cal. Code Civ. Proc. § 410.10).  For a court to exercise personal jurisdiction over a nonresident defendant, that defendant must have sufficient "minimum contacts" with the relevant forum state such that the exercise of jurisdiction "does not offend traditional notions of fair play and substantial justice."  *International Shoe Co. v. Washington,* 326 U.S. 310, 316 (1945) (internal quotation marks and citation omitted).

Even if a defendant has not had continuous and systematic contacts with the state sufficient to confer general jurisdiction, a court may exercise specific jurisdiction when (1) the non-resident defendant purposefully directs his activities or consummates some transaction with the forum state or resident thereof or performs some act by which he purposefully avails himself of the privileges of conducting activities in the forum state, thereby invoking the benefits and protections of its laws; (2) the claim arises out of or relates to the defendant's forum-related activities; and (3) the exercise of jurisdiction is reasonable.  *Caruth v. Int'l Psychoanalytical Ass'n,* 59 F.3d 126, 127 (9th Cir. 1995).

In examining prong one of the specific jurisdiction analysis in a torts case, courts typically apply the purposeful direction analysis.  *Ziegler v. Indian River Cnty.*, 64 F.3d 470, 473 (9th Cir. 1995).  Since this case is primarily based in tort, the purposeful direction analysis is applicable.  In the purposeful direction analysis, courts examine whether (1) the defendant committed an intentional act; (2) the act was expressly aimed at the forum state; and (3) the likelihood that the defendant knew that act would cause harm to be suffered in the forum state.  *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 805 (9th Cir. 2004).

Intentional acts are an "external manifestation of the actor's will and do[ ] not include any of its results, even the most direct, immediate, and intended."  *Id.* at 806 (citing The Restatement (Second) of Torts 2 (1964)).  An external manifestation of an actor's will can include activities that occur outside of the forum state so long as those activities are intended to have an effect in the forum state.  *See, e.g. Sinatra v. Nat'l Enquirer, Inc.*, 854 F.2d 1191 (9th Cir. 1988) (clinic's uttering of false statements

about Sinatra in Switzerland were expressly aimed at California because it was "an event within a sequence of activities designed to use California markets for the defendant's benefit."); *see also Calder v. Jones*, 465 U.S. 783, 788 (1984) (intentional acts were the researching, writing, editing, and publishing of an allegedly libelous tabloid, all of which occurred in Florida having an effect in California).

When the defendant knows that the plaintiff to be affected by the wrongful conduct is a resident of the forum state, the defendant has aimed his acts at the forum state. *See Bancroft & Masters, Inc. v. Augusta Nat. Inc.*, 223 F.3d 1082, 1087 (9th Cir. 2000) (express aiming is satisfied when "the defendant is alleged to have engaged in wrongful conduct targeted at a plaintiff whom the defendant knows to be a resident of the forum state."); *see also Washington Shoe Co. v. A-Z Sporting Goods Inc.*, 704 F.3d 668, 675 (9th Cir. 2012).

Last, the plaintiff must suffer the "brunt of the harm" in the forum state. *See Dole Food Co. v. Watts*, 303 F.3d 1104, 1112 (9th Cir. 2002).

## IV.   DISCUSSION

The parties agree that there are not sufficient facts at present for a finding of general jurisdiction.  (Mot. 6; Opp'n 8.)   Therefore, the Court focuses its inquiry solely on the issue of specific jurisdiction.  The Court analyzes specific jurisdiction for each the two defendants separately.

**A. Cimatoribus**

The fiduciary shield doctrine prevents a corporation's minimum contacts from being automatically imputed to officers and employees in their personal capacity. However, this protection is by no means absolute.   "The fiduciary shield doctrine may be ignored in two circumstances: (1) where the corporation is the agent or alter ego of the individual defendant; or (2) by virtue of the individual's control of, and direct participation in the alleged activities." *Mulato v. Wells Fargo Bank, N.A.*, 76 F. Supp. 3d 929, 945 (N.D. Cal. 2014) (quoting *j2 Global Commc'ns, Inc. v. Blue Jay, Inc.,* No. 08–cv–4254 PJH, 2009 WL 29905, at *5 (N.D. Cal. Jan. 5, 2009)).  Generally, to fall

under the second prong an individual must have been the "guiding spirit behind the wrongful conduct . . . or the central figure in the challenged corporate activity." *Davis v. Metro Prods., Inc.*, 885 F.2d 515, 524 n.10 (9th Cir. 1989) (internal quotations omitted).

Here, the evidence submitted is clear: Cimatoribus was neither the alter ego of Limacorporate nor the "guiding spirit" behind the alleged tortious conduct.  First, Cimatoribus has never been an officer or director of either Limacorporate or Lima USA and has never had an ownership stake in either company.  (Cimatoribus Decl. ¶ 4, ECF No. 11–1.)  Second, as Cimatoribus alleges, the uncontroverted evidence shows that he was only involved in this transaction from an administrative standpoint.  (Reply 6, ECF No. 18.)  The emails between Cimatoribus and Dworkin can largely be allocated to one of three categories: (1) emails where Cimatoribus is organizing meetings or other activities for Dworkin and others (ECF No. 14, Exs. 1, 3–6, 10, 12–16, 18, 20, 22, 30, 36, 39); (2) emails where Cimatoribus is requesting a document or information from Dworkin (*Id.*, Exs. 2, 8, 17, 21); and (3) emails where Cimatoribus is providing Dworkin with a document or communicating a specific detail about the agreement  (*Id.*, Exs. 17, 19, 23).   None of these emails show Cimatoribus to be involved in direct negotiations or anything more than a cursory discussion about the substantive terms of the agreement.  These findings are consistent with Cimatoribus' declaration, which indicates that he was merely communicating with Dworkin on behalf of Piovani (at his "instruction") and that he had no authority to draft the agreement with Dworkin or negotiate with Dworkin.[13]  (Cimatoribus Decl. ¶¶ 17–18.)  As such, Plaintiffs have not alleged facts sufficient to establish that Cimatoribus

---

[13]  Cimatoribus also made several phone calls to Dworkin and met Dworkin once in Chicago.  (Cimatoribus Decl. ¶ 16.)  However, there is nothing to suggest those interactions were any more substantive.

exercised the requisite control over the transaction on which this tort action is based to warrant an exception to the fiduciary shield doctrine.[14]

The Court's finding is entirely consistent with *Winery v. Graham*, No. C 06 3618 MHP, 2007 WL 963252 (N.D. Cal. Mar. 29, 2007). *Winery* concerned tortious conduct related to a contract for cases of wine. *Id.* at *1–2. In *Winery*, the plaintiff was attempting to sue two employees of a wine purchaser for their role in the tortious conduct.[15] *Id.* at *2. The plaintiff alleged that one of the two defendants, Michael Anders, was sufficiently involved in the tortious conduct to establish the "control" necessary for an exception to the fiduciary shield doctrine. *Id.* at *6. The court in *Winery* found otherwise. *Id.* at *7.

As here, the primary evidence of Anders' control was his engagement in email and phone conversations with the plaintiff. *Id.* at *6. In these communications, Anders discussed nonspecific business dealings between the wine purchaser and the plaintiff, provided certain contact information, and conveyed an offer about the contract's payment terms. *Id.* However, the court found that because the evidence did not show that Anders engaged in negotiations and because the communications showed he was not "doing anything other than acting on behalf of [the wine purchaser] at the instructions of other [wine purchaser] personnel" he was not subject to personal jurisdiction. *Id.* This is the exact reasoning the Court adopts here with regard to Cimatoribus.

The Court finds that this result is also consistent with a general trend the district courts to find that employees, who are not officers and directors, are protected by the fiduciary shield doctrine. *See Mulato*, 76 F. Supp. 3d at 945–46 (cumulating cases

---

[14] It is clear that Piovani was at least one of the "guiding spirits" in these contract negotiations; Cimatoribus was setting up times for Piovani to negotiate with Dworkin. (*See* ECF No. 14, Exs. 1, 3, 4, 5, 6, 12–16.) Further, Piovani was the person Dworkin consulted when he wanted changes to the contract. (*See id.*, Exs. 28, 33.).

[15] The plaintiff was suing the two individuals rather than the wine purchaser because the wine purchaser was in bankruptcy proceedings. *Winery*, 2007 WL 963252, at *1.

where courts declined to disregard the fiduciary shield doctrine for mere employees). In conclusion, the Court finds that Cimatoribus' contacts with California were administrative in nature and were entirely on behalf of his employer in the course of his duties as an employee.   Cimatoribus appears to have had no contact with California other than that which has been discussed here.  (*See generally* Cimatoribus Decl. ¶ 5–15.)    Therefore, the Court **GRANTS**[16] the motion to dimiss as to Cimatoribus.[17]

**B. Lualdi**

On the other hand, the Court finds that Lualdi, who signed the final representative agreement, is not protected by the fiduciary shield doctrine.  The case law is clear that a corporate officer is not protected by the fiduciary shield doctrine where he ratifies the wrongful activity.  *Allstar Mktg. Grp., LLC v. Your Store Online, LLC*, 666 F. Supp. 2d 1109, 1121 (C.D. Cal. 2009) (quoting *Matsunoki Group, Inc. v. Timberwork Oregon, Inc.*, No. C 08–04078 CW, 2009 WL 1033818, at *3 (N.D. Cal. Apr. 16, 2009)); *see also Margulis v. Medical Parts Int'l Inc.*, 1999 WL 183648, at *5 (N.D. Ill. Mar. 25, 1999) ("the fiduciary shield defense is unavailable to high-ranking company officers and shareholders" because these individuals "have a direct financial stake in the company's health and therefore can be subjected to personal jurisdiction for actions that result in both personal and corporate benefit.").   By signing the contract, Lualdi, as president of Lima USA and as president of the board of directors for Limacorporate, ratified the misrepresentations allegedly contained therein.   As such, the Court applies the specific jurisdiction framework to determine whether Lualdi's contact with California is sufficient to warrant personal jurisdiction.

---

[16] Plaintiffs ask for jurisdictional discovery in the event that personal jurisdiction is not found for either Cimatoribus or Lualdi.  (Opp'n 20.)  However, Plaintiff does not explain why jurisdictional discovery is warranted as to Cimatoribus.  (*Id.* at 20–21.)  Therefore, the Court will not grant jurisdictional discovery to uncover additional contacts relating to Cimatoribus.
[17] The Court notes that Plaintiffs fail to discuss the fiduciary shield doctrine as applied to Cimatoribus in their opposition.

### 1. Purposeful Direction

The Court finds Lualdi's signing of the distribution contract that contained alleged misrepresentations to be an act purposefully directed at the forum state. First, it is clear that Lualdi intended to sign a contract with Plaintiffs.[18] Lualdi's signature on this contract was the final step in Limacorporate's calculated, yearlong effort to enter the United States market for medical devices, a plan which the president of Lima USA and president of the board at Limacorporate would no doubt have been aware of.[19] (Compl. ¶¶ 9, 11.)

Likewise, the relevant act in the instant case was aimed at the forum state. The contract that Lualdi signed containing the alleged misrepresentations was specifically designed to induce Plaintiffs to render distribution services *within a specific territory of the forum state*. (ECF No. 14, Ex. 35 at 19.) Further, it is clear to anyone who reads the contract, as presumably Lualdi did before signing, that Plaintiffs reside in the forum state. In section 18.4 of the contract relating to "notices" and "communications," Plaintiffs list their address as "6222 E. Tamarind St. Oak Park, California 91377." (ECF No. 14, Ex. 35 at 15.) *See Bancroft & Masters*, 223 F.3d at 1087 (express aiming is satisfied when "the defendant is alleged to have engaged in wrongful conduct targeted at a plaintiff whom the defendant knows to be a resident of the forum state."). Finally, the parties do not dispute that Plaintiff suffered the brunt of the harm in California. Because Plaintiffs have satisfied all three of the required elements, the Court finds purposeful direction.

The Court notes that *United Tactical Sys. LLC v. Real Action Paintball, Inc.*, 108 F. Supp. 3d 733, 747 (N.D. Cal. 2015), a case cited in Plaintiffs' opposition,

---

[18] Lualdi argues in the pending motion to dismiss that the first prong of the purposeful direction analysis requires a "wrongful" intentional act citing *Washington Shoe*, 704 F.3d at 673. (Mot. 10.) However, as Plaintiffs rightly point out, *Washington Shoe* references only an intentional act not a "wrongful" intentional act. (Opp'n 10.)

[19] Clearly this case is very different from the textbook products liability case where a plaintiff places a product into the stream of commerce and it happens to end up in the forum state. Here, the contract was specifically for distribution rights to a defined area within the forum state.

found the requisite purposeful direction under very similar circumstances.  As here, the *United Tactical* court was tasked with determining whether to subject a company's manager to personal jurisdiction for signing a contract (technically a "guaranty") that formed the basis of the charged tortious conduct.  *Id.* at 747–748.  The *United Tactical* court found that signing a contract was sufficient to find purposeful direction where the contract affected California residents, was to be carried out in California, and caused the plaintiff economic harm in California.  *Id.* at 748–749.  All of these factors are present in the instant case.[20]

## 2. Forum Activities

This prong is satisfied if the plaintiff would not have been injured "but for" the defendant's conduct directed at the forum state.  *See Panavision Int'l,* 141 F.3d at 1322 (considering whether plaintiff would have been injured but for the defendant's conduct directed toward plaintiff in California).  Plaintiffs' causes of action stem from reliance on terms of a contract that allegedly contained misrepresentations.  This contract would not have been effectuated but for Lualdi's signature.  Therefore, the Court finds that Plaintiffs have established the second prong.  *See United Tactical*, 108 F. Supp. 3d at 749–50 (applying similar logic to find the second prong of the personal jurisdiction analysis satisfied).

---

[20] In finding purposeful direction, the Court considered Lualdi's arguments but ultimately found them unpersuasive.  Lualdi makes much of the fact that he was not involved with negotiations and had no direct contact with Dworkin. (Mot. 10; Reply 4.)  However, such arguments ignore the fact that Lualdi was involved at a much more important level: deciding whether to accept or reject the negotiated contract containing the alleged misrepresentations.  To adopt the policy Lualdi proposes would lead to perverse results.  Heads of corporations could effectively insulate themselves from personal jurisdiction by having low-level employees negotiate contracts containing misrepresentations, which they would then later ratify, rather than making the misrepresentations themselves during the negotiation process.  In both instances, the corporate head knows that the plaintiff entering into a contract containing misrepresentations and yet in only one of the two scenarios would the corporate head be subject to personal jurisdiction.  The Court finds it is proper to place at least as much emphasis on the result (the signing of the contract) as the process (negotiating the contract) because without the result, the process would be meaningless.

**3. Reasonableness**

As Plaintiffs have established the first two prongs of the personal jurisdiction analysis, the burden shifts to Lualdi to show that it is unreasonable to subject him to personal jurisdiction in California.   Lualdi must make a "compelling case" for unreasonableness.  *Burger King v. Rudzewicz*, 471 U.S. 462, 476–477 (1985).  The Court weighs seven factors in making its determination:

> (1) the extent of a defendant's purposeful interjection; (2) the burden on the defendant in defending in the forum; (3) the extent of conflict with the sovereignty of the defendant's state; (4) the forum state's interest in adjudicating the dispute; (5) the most efficient judicial resolution of the controversy; (6) the importance of the forum to the plaintiff's interest in convenient and effective relief; and (7) the existence of an alternative forum.

*Dole*, 303 F.3d at 1114.

**a.  Evaluating the Seven Factors**

**i.  *Purposeful Interjection***

The Court already found above that Lualdi purposefully directed an act toward California by signing the contract containing alleged misrepresentations.   To the extent that the purposeful interjection may also encompass more general contacts with the state, the Court recognizes that Lualdi has traveled to California for both business and pleasure, primarily in connection with his attendance at surgical conferences.  (Lualdi Decl. ¶ 15.)  Thus, this factor leans in Plaintiffs' favor.

**ii.  *Burden on Defendants***

Lualdi is now retired and living in Italy.  (Lualdi Decl. ¶ 2–3.)  Coming to California to defend himself in this lawsuit would therefore represent a serious hardship both in terms of expense and inconvenience.  (Lualdi Decl. ¶ 19); *see also*

*Dole*, 303 F.3d at 1115 (finding expense and inconvenience associated with international travel to be relevant considerations).   Further, Lualdi would have to defend himself in a foreign legal system with which he has no previous personal experience.  (Lualdi Decl. ¶ 7); *see also Asahi Metal Indus. Co. v. Superior Court,* 480 U.S. 102, 114 (1987) ("The unique burdens placed upon one who must defend oneself in a foreign legal system should have significant weight in assessing the reasonableness of stretching the long arm of personal jurisdiction over national borders.").  As such, this factor weighs strongly in favor of Lualdi.

### iii.   *Extent of Conflict with Sovereignty of Foreign State*

As with any case involving a foreign defendant residing in his country of citizenship, the very nature of compelling such a defendant to appear in the United States involves some incursion onto the sovereignty of the defendant's country of citizenship.  *See Sinatra*, 854 F.2d at 1199; *Asahi*, 480 U.S. at 103 ("The procedural and substantive policies of other nations whose interests are affected by the forum state's assertion of jurisdiction over an alien defendant must be taken into account, and great care must be exercised when considering personal jurisdiction in the international context.").  While the Court is mindful of this fact, it nonetheless finds that this factor weighs only minimally, if at all, in Lualdi's favor.

To begin, the Court agrees with Lualdi's general contention that Italy has an interest in protecting its citizens.  (Mot. 16.)  Yet Lualdi does not clearly identify how Italy's laws would better protect him in this lawsuit or how Italy's laws conflict with the laws of California relevant to this case.  *See Excel Plas, Inc. v. Sigmax Co.*, No. 07-CV-578 IEGJMA, 2007 WL 2853932, at *10 (S.D. Cal. Sept. 27, 2007) (finding that because Japan's laws and California's laws were similar as to the relevant issues of the case, this factor weighed in favor of jurisdiction in California); *see also United Kingdom Mut. S.S. Assurance Ass'n v. Cont'l Maritime of San Francisco, Inc.,* 1992 WL 486937, at *5 (N.D. Cal. Aug. 31, 1992) (finding that the sovereignty factor weighed in favor of jurisdiction in California because there was no conflict between

relevant Canadian law and U.S. law).  Additionally, Lualdi does not allege that this case involves property in Italy, a member of the Italian government, or an issue of national importance in Italy.  Thus, the Court finds that this factor weighs only very minimally in Lualdi's favor.

### iv.   *Forum State's Interest in Adjudication*

It has long been recognized that "California has a strong interest in providing a forum for its residents and citizens who are tortiously injured."  *Dole*, 303 F.3d at 1115–16 (citing *Panavision Int'l*, 141 F.3d at 1323); *see also CFA Northern Cal., Inc. v. CRT Partners LLP*, 378 F. Supp. 2d 1177, 1187 (N.D. Cal. 2005) (finding that California has an interest in assuring that "contracts made with its residents are not breached and that its residents are not defrauded").

Lualdi argues that the forum state's interest is nullified by Plaintiffs' ability to seek arbitration against Lima USA regarding the alleged breach of contract.  (Mot. 16; Reply 10.)  However, in this federal case, Plaintiffs are seeking relief against parties not presently involved in that arbitration based on the parties' individual involvement in tortious conduct.  Further, Plaintiffs seek to affect the arbitration by obtaining declaratory relief in this federal case.  This case must therefore, be looked at as separate and distinct from that arbitration.[21]  Thus, California would have an interest and this factor weighs in Plaintiffs' favor.

### v.   *Efficient Resolution*

In analyzing the efficient resolution factor, courts consider where the injury occurred and where the critical witnesses and evidence are located. *See Excel Plas*, 2007 WL 2853932, at *11 (citing *Amoco Egypt Oil Co. v. Leonis Nav. Co., Inc.*, 1 F.3d 848, 852 (9th Cir. 1993)).  However, this factor is "no longer weighed heavily given the modern advances in communication and transportation."  *Panavision Int'l*, 141 F.3d at 1323.

---

[21] Lualdi has not cited a single case for the proposition that arbitration removes the forum state's interest in a separate but related federal case. (Mot. 17; Reply 10.)

The parties do not contest that the injury in this case occurred in California. The parties do contest where the critical witnesses reside. Plaintiffs assert that the "sales associates and surgeons" are the "principal witnesses" and they are located in California. (Opp'n 19.) For its part, Lualdi asserts that the principal witnesses are Limacorporation employees, all of whom reside in Italy. (Reply 10–11.) The truth is that both sets of witnesses are likely to be important in this case. Therefore, the Court finds that the parties arguments about witness location largely cancel each other out. Thus, the Court is left with a very slight advantage for Plaintiffs based on the location of the injury. *See Excel Plas*, 2007 WL 2853932, at \*11 (applying the same logic where parties were in conflict over location of important witnesses).

### vi.   *Importance of the Forum to Plaintiffs*

To the extent this factor still carries any weight, it obviously tilts towards Plaintiffs as they reside in California, the forum state. *Caruth*, 59 F.3d at 129 (finding that this factor remains only "nominally" part of the overall reasonableness test.)

### vii.   *Availability of an Alternate Forum*

The only alternate forum in this case appears to be Italy. However, Lualdi has not put forth any evidence establishing that Italy would adjudicate such a case or that Italy's laws would allow Plaintiffs to allege similar causes of action. The Court therefore finds this factor leans slightly in Plaintiffs' favor.[22]

### b.  Balancing the Factors

This is a close case. While Plaintiffs technically carry more total factors, Lualdi carries the heavy burden of litigating this case in California. However, the Court finds that "modern advances in communication and travel" help reduce the burden on foreign defendants and that foreign defendants, as a general matter, should not be immune from personal jurisdiction in a particular forum merely because they reside abroad. *See Sinatra*, 854 F.2d at 1199; *see also Dole*, 303 F.3d at 1117 (finding

---

[22] Lualdi argues that arbitration against Lima USA is an appropriate alternate forum. (Mot. 17.) However, this Court has already discussed the problems with that perspective in the "Forum State's Interest in Adjudication" section above.

personal jurisdiction over foreign defendant reasonable), *Roth v. Garcia Marquez*, 942 F.2d 617, 625 (9th Cir. 1991) (same); *Ballard v. Savage*, 65 F.3d 1495, 1502 (9th Cir. 1995) (same).   Taking all of this into account, the Court finds that Lualdi has not made a case for unreasonableness that rises to the level of "compelling" and thus is subject to personal jurisdiction in California.   *Caruth,* 59 F.3d at 129 ("[G]iven the closeness of the factors, we conclude that [defendant] has not presented a 'compelling case' that exercising jurisdiction over it would be unreasonable.").   Accordingly, the Court **DENIES** the motion to dismiss with regard to Lualdi.

## V.   CONCLUSION

Based on the foregoing, the Court **GRANTS** Defendants Stefano Cimatoribus and Gabriele Lualdi's motion to dismiss for lack of personal jurisdiction as to Defendant Cimatoribus and **DENIES** the motion as to Defendant Gabriele Lualdi. The Clerk of Court shall close the case as to Defendant Cimatoribus.

**IT IS SO ORDERED.**

December 9, 2016

_____

**OTIS D. WRIGHT, II**
**UNITED STATES DISTRICT JUDGE**